**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| League of Women Voters of Arizona, et al., | No. CV-18-02620-PHX-JAT |
| Plaintiffs, | **ORDER** |
| v. | |
| Michele Reagan, | |
| Defendant. | |

Pending before the Court is Plaintiffs' Motion for Preliminary Injunction (Doc. 5).[1] The Court held a preliminary injunction hearing ("Hearing") on September 12, 2018 and took this matter under advisement. This Order states the Court's findings of fact and conclusion of law.

## I.    BACKGROUND

Plaintiffs League of Women Voters of Arizona, Mi Familia Vota Education Fund, and Promise Arizona (individually and collectively, "Plaintiffs") bring this action against Defendant Michele Reagan ("Defendant"), in her official capacity as Secretary of State for the State of Arizona, under Section 5 of the National Voter Registration Act ("NVRA"). 52 U.S.C. § 20504 ("Section 5"). On August 18, 2018, Plaintiffs filed suit

---

[1] As noted in the Court's Order Setting Preliminary Injunction Hearing (Doc. 15), the Court deems Plaintiffs' erroneously titled motion for an "Application for an Order to Show Cause Why a Preliminary Injunction Should Not be Entered." (Doc. 5) to be a Motion for Preliminary Injunction. "Plaintiffs cannot shift their burden of showing they are entitled to a preliminary injunction to Defendant[] via a show cause request." (Doc. 15 at 1); *see also Medley v. Arpaio*, No. CV 08-086-PHX-MHM (DKD), 2008 WL 3911138, at *3 (D. Ariz. Aug. 21, 2008) ("the burden for a preliminary injunction is on Plaintiff").

against Defendant ("Complaint," Doc. 1) and filed the pending Motion for Preliminary Injunction (Doc. 5). Pursuant to the Court's accelerated briefing schedule in this matter, Defendant filed a timely Response (Doc. 22) on August 31, 2018. Plaintiffs then filed a Reply (Doc. 25) on September 5, 2018.

## A. Procedural Background

On November 14, 2017, Counsel for Plaintiffs sent a letter (Doc. 1-1 at 2–16) to Defendant notifying Defendant, the Arizona Department of Transportation ("ADOT"), and related state agencies of alleged NVRA violations. (Doc. 5 at 1). Plaintiffs' November 2017 letter triggered the NVRA's 90-day notice period for Defendant to cure the alleged violations, after which Plaintiffs stated, they "will have no alternative but to initiate litigation[.]" (Doc. 1-1 at 16; *see also* 52 U.S.C. § 20510(b)(2)). The 90-day period expired on February 12, 2018 without Defendant taking remedial actions acceptable to Plaintiffs, and without Plaintiffs following through with their promise to "initiate litigation"—until six months later. (Doc. 28-1 ¶¶ 34–35).[2]

## B. NVRA

Enacted in 1995, the NVRA sets out to "establish procedures that will increase the number of eligible citizens who register to vote" in federal elections, "enhance[] the participation of eligible citizens as voters" in federal elections, "protect the integrity of the electoral process," and "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b). "These purposes counterpose two general, sometimes conflicting, mandates: To expand and simplify voter registration processes so that more individuals register and participate in federal elections, while simultaneously ensuring that voter lists include only eligible . . . voters." *Ariz. Democratic Party v. Reagan*, No. CV-16-03618-PHX-SPL, 2016 WL 6523427, at *12 (D. Ariz. Nov. 3, 2016) (quoting *Common Cause of Colo. v. Buescher*, 750 F.Supp.2d 1259, 1274 (D. Colo. 2010)).

With regard to change of address notifications, Section 5 of the NVRA provides,

_____

[2] On August, 14, 2018, Plaintiffs reached an Interim Memorandum of Understanding ("MOU," Doc. 1-1 at 18–25) with ADOT and the related agencies, but reached no such agreement with Defendant prior to filing this suit on August 18, 2018. (Doc. 5 at 1).

in pertinent part:

> Any change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license *shall* serve as notification of change of address for voter registration with respect to elections for Federal office for the registrant involved *unless* the registrant states on the form that the change of address is not for voter registration purposes.

52 U.S.C. § 20504(d) (emphasis added).

With regard to new driver's license applications, Section 5 of the NVRA similarly provides that "[e]ach State motor vehicle driver's license application (including any renewal application) submitted to the appropriate State motor vehicle authority under State law *shall* serve as an application for voter registration with respect to elections for Federal office *unless* the applicant fails to sign the voter registration application." 52 U.S.C. § 20504(a)(1) (emphasis added). Any such application "shall be considered as updating any previous voter registration by the applicant." 52 U.S.C. § 20504(a)(2). The statute further provides that "[t]he voter registration application portion of an application for a State motor vehicle driver's license [] may not require any information that duplicates information required in the driver's license portion of the form." 52 U.S.C. § 20504(c)(2)(A).

### C. MVD Forms

Among other issues identified in Plaintiffs' November 2017 letter, Plaintiffs allege that ADOT's Motor Vehicle Division ("MVD") uses forms that require a user to "opt-in," rather than "opt-out" of updating their voter registration address during a driver's license application, renewal, or change-of-address transaction with MVD ("Covered Transaction"). (Doc. 5 at 6–7).

#### 1. Written Forms

Defendant provides that MVD forms "for the past twenty-three (23) years"—ever since the NVRA was enacted—"for in-person written applications contained a box for the applicant to check if an applicant wanted to have [her] voting registration addresses updated." (Doc. 22 at 3). From November 2016 to approximately February 2018, the

yes/no question was phrased as follows: "Are you a United States citizen who wishes to register to vote or update your existing voter registration?" (Doc. 22 at 3). The written form used from February 2018 to present asks the question similarly with the same yes/no checkbox response: "Do you wish to register to vote or update your existing voter registration **AND** are you a U.S. citizen?" (*Id.*) (emphasis in original). Regardless of whether the form is for a new driver license or state identification application or renewal, MVD forms consistently phrase the voter registration question in a yes/no format. (Plaintiffs' Exhibits 3–5). Plaintiffs argue that the current MVD forms require an applicant to opt-in to updating her voter registration address by selecting "yes," as opposed to updating by default unless an applicant affirmatively checks "no."

### 2. Online Forms

Defendant provides that MVD launched an online form for an applicant to amend her MVD address in 1999; four years after the NVRA was enacted. (Doc. 22 at 4). Online forms—utilized for the majority of Covered Transactions since November 2016—contain a message at the bottom of the page confirming a successful MVD change-of-address, which states that applicants "can also register to vote or update your voter registration" by toggling a "Register to Vote" button. (Doc. 28-1 ¶¶ 20–22; Plaintiffs' Exhibit 7 at PLTS0040). Online, an applicant must effectively opt-in to updating her voter registration information at the end of the MVD change-of-address process by manually toggling the "Register to Vote" button, instead of automatically having the new address information used for voting purposes. (*Id.*). The "Register to Vote" button triggers a new form in the same window, which requires a user to input minimal, additional information and verify the new address information that automatically populates into the applicable field to update an applicant's voter registration. (Plaintiffs' Exhibit 7 at PLTS0041–53).

Unless an applicant selects "Yes" to update her voter registration via a written form or completed the "Register to Vote" option in an online transaction, Defendant does not automatically update an individual's voter registration address to match her MVD address. (Doc. 28-1 ¶¶ 23–24).

- 4 -

### D. Potential Election Impact

Defendant provided at the Hearing that 488,100 individuals updated their MVD address since November 9, 2016. (Doc. 26-1 ¶ 23; Hearing Transcript ("Tr.") at 31:16). Of those, Defendant identified approximately 384,000 transactions involving registered voters. (Doc. 26-1 ¶ 24; Tr. at 60:19). MVD does not maintain records as to whether an individual changed her voter registration address at the same time. (Doc. 26-1 ¶ 24; Tr. at 31:8). Under Arizona's precinct-based voting system, a voter who changed residences since the last election is required to vote in the polling location associated with her new address. A.R.S. §§ 16-122, 16-135, 16-584(C).

If an individual moves from one county to another and did not update her voter registration address with the appropriate County Recorder, the individual may not cast a valid ballot because she is not registered to vote in the proper county. (Doc. 28-1 ¶ 28). Plaintiffs are concerned that the process of not automatically updating voter registration addresses to match MVD address updates will cause voters to be registered at the incorrect address and then vote a ballot out-of-precinct ("OOP"), which would be invalid, in the upcoming election set for November 6, 2018. (Doc. 5 at 18). The number of ballots cast OOP and thus rejected has decreased steadily over recent elections from 14,885 OOP ballots in 2008, to 10,979 OOP ballots in 2012, to only 3,970 OOP ballots in 2016. (Doc. 5 at 19–20; Doc. 22 at 15). Defendant represented at the Hearing that the number of ballots cast OOP and thus rejected is again expected to fall in the upcoming 2018 election. (Tr. at 77:21).

## II. LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish that: (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in her favor, and (4) that an injunction is in the public interest. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Natural Resources Defense Council*, 555 U.S. 7,

20 (2008)).[3] When a plaintiff seeks a mandatory injunction, the burden is "doubly demanding," in that "she must establish that the law and facts *clearly favor* her position, not simply that she is likely to succeed." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (emphasis in original). The Ninth Circuit further "recognizes that election cases are different from ordinary injunction cases" because "[i]nterference with impending elections is extraordinary[.]" *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003) (citation omitted).

## III.   ANALYSIS

### A.   Likelihood of Success on the Merits

Plaintiffs seeking a preliminary injunction must first establish a likelihood to succeed on the merits. *Am. Trucking Ass'ns*, 559 F.3d at 1052.

#### 1.   Standing

Article III of the United States Constitution limits federal courts to resolving "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). To have standing to litigate in federal court, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan v Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing [standing]." *Id.* "The issue here is whether [P]laintiffs have Article III standing, either organizational (or direct) standing based on a diversion-of-resources theory or associational standing based on injury to their members." *League of Women Voters of*

---

[3] The Ninth Circuit has articulated an "alternate formulation" of the *Winter* preliminary injunction test, under which "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted)). Here, the Court reaches the same conclusion under both the traditional *Winter* test and the alternate formulation based on the forthcoming analysis. *See infra* Part III.

*Cal. v. Kelly*, No. 17-CV-02665-LB, 2017 WL 3670786, at *6 (N.D. Cal. Aug. 25, 2017).

### a.    Organizational Standing

An organization has "direct standing to sue" when it shows "a drain on its resources from both a diversion of its resources and frustration of its mission." *Fair Hous. of San Fernando Valley v. Rommate.com*, 666 F.3d 1216, 1219 (9th Cir. 2012) (citation omitted). The organization's "standing must be established independent of the lawsuit filed by the plaintiff." *Id.* "An organization cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (internal quotation marks and citation omitted).

Here, Plaintiffs allege "that they diverted resources to register voters rather than spending time, staff, and money on other activities relating to their organizational missions" due to Defendant's alleged non-compliance with the NVRA. *League of Women Voters of Cal.*, 2017 WL 3670786, at *6; (*see also* Complaint ¶¶ 7–8, 13–14, 18–19). "These allegations—that [Plaintiffs] 'changed their behavior' because of the alleged violations and 'expended additional resources that they would not otherwise have expended, and in ways that they would not have expended them'—established an injury attributable to [Defendant's] noncompliance and thus satisfied Article III standing." *Id.* at *6 (citing *National Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040–41 (9th Cir. 2015)). Moreover, Plaintiffs allege that the injury is on-going because Plaintiffs will "continue to expend resources . . . to provide voter registration services to individuals" affected by Defendant's alleged NVRA violation. (Doc. 5-1 at 4–5, 9, 13–14).

"At the pleadings stage, the court accepts the factual allegations as true. And at the pleadings stage, the standard requires that [P]laintiffs allege a causal connection between [Defendant's] alleged NVRA violations and their reactions to them." *League of Women Voters of Cal.*, 2017 WL 3670786, at *7 (finding that Plaintiffs established standing by alleging that they diverted resources to "register voters who should have been registered through the [MVD]"). Each Plaintiff organization conducts periodic voter drives and

seeks to educate voters on how to ensure voter registration addresses are current. (Complaint ¶¶ 11, 16, 19). It stands to reason that Plaintiffs will encounter some voters who updated their MVD addresses, but are seeking clarification as to whether their voter registration addresses were updated concurrently. (*Id.*; *see also* Doc. 24-1). Accordingly, the Court finds that Plaintiffs' diversion of resources argument is sufficiently plausible "to meet the low bar imposed by federal constitutional standing jurisprudence." *Hossain v. Am. Sec. Ins. Co.*, No. CV 15-8138 (JBS/KMW), 2016 WL 492758, at *4 (D.N.J. Feb. 8, 2016) (collecting cases).

### b. Associational Standing

An organization has associational standing "to bring suit on behalf of its members when its members would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 169 (2000) (citation omitted). "To show that at least one of its members would have standing to sue in his or her own right, [Plaintiffs] must identify at least one member with standing and show that the member has suffered an injury-in-fact." *Advocates for Individuals with Disabilities Found., Inc. v. Circle K Properties, Inc.*, No. CV-16-02358-PHX-SPL, 2017 WL 2637886, at *3 (D. Ariz. Mar. 20, 2017) (citing *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996) ("an organization suing as representative [must] include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association.")). The Ninth Circuit has opined that, "[w]here it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action . . ., we see no purpose to be served by requiring an organization to identify by name the member or members injured." *Nat'l Council of La Raza*, 800 F.3d at 1041.

Here, each Plaintiff organization alleges that it "has at least one member who has updated [her] driver's license address with ADOT/MVD and has been harmed by

[Defendant's] failure to update [her] residence address for voting purposes." (Complaint ¶¶ 7, 13, 18). Plaintiffs do not identify any individuals by name in the Complaint (Doc. 1), but attached affidavits to their Reply (Doc. 24) naming two purportedly affected members of Plaintiff League of Women Voters of Arizona. (*See generally* Doc. 24-1). Both members claim to have updated their MVD address, but unwittingly did not concurrently update their voter registration addresses. (Doc. 24-1 at 3, 5). However, both members were informed of the oversight prior to attempting to vote with an outdated address and do not allege disenfranchisement. (*Id.*). While the burden imposed by being urged to register to vote or update one's registration with a current address—in compliance with state election laws—appears quite light, in accepting all of Plaintiffs allegations as true at the pleadings stage, the Court will proceed as if Plaintiffs meet their burden of establishing associational standing herein. *See, e.g.*, *Ass'n of Cmty. Organizations for Reform Now v. Scott*, No. 08-CV-4084-NKL, 2008 WL 2787931, at *7 (W.D. Mo. July 15, 2008) (reasoning that "any additional barrier to voting imposed, in this case requiring [an individual] to file a change-of-address form where it would have been unnecessary had [the State] followed the law, satisfies any requirement of a concrete injury for purposes of standing").[4]

## 2. NVRA Violation

Plaintiffs allege that Section 5 of the NVRA requires MVD to present an individual with the opportunity to opt-out from, rather than opt-in to, updating her voter

---

[4] The Court observes that while Plaintiffs attempt to connect the alleged NVRA violation to the constitutional right to vote, Plaintiffs point to no specific member of any Plaintiff organization who was actually deprived of that constitutional right. (*Compare* Complaint ¶ 74 *with* Doc. 24-1 at 3, 5). Both individuals identified by name in Plaintiffs' affidavits successfully updated their voter registration information and were not denied their right to vote at any stage of the process. (Doc. 24-1 at 3, 5). Accordingly, Plaintiffs concern that Defendant's "failure to ensure proper compliance with the NVRA may result in complete disenfranchisement" of certain Arizona residents is wholly unsubstantiated by the evidence before this Court. (Complaint ¶ 71). Plaintiffs may have established an injury in fact based on a diversion of resources theory for organizational standing, but do not put forth sufficient evidence to establish a constitutional injury related to the deprivation of voting rights. The members who had to take on an additional voter registration burden upon finding out that their respective voter addresses did not automatically update to match their updated MVD addresses incurred some inconvenience, which may be cognizable, but were never deprived of the right to vote. (Doc. 24-1 at 3, 5).

registration address during a Covered Transaction. (Doc. 5 at 6–7). Here, "for purposes of this litigation [Defendant] is willing to accept the Plaintiffs' position, and the MVD forms and the necessary computer changes are already in the process of [being] modified." (Doc. 22 at 4). Defendant, however, represents that modifications to the written forms "should be completed by October 2019" and the changes requested by Plaintiffs to the online system will be implemented "sometime early in 2019" following a change in government computer venders. (*Id.* at 4–5). As a result, the requested modifications will not be in place for the upcoming general election on November 6, 2018. (Doc. 28-1 ¶ 39). While Defendant maintains a colorable argument that a voter, "by failing to check the box indicating a desire to change [her] voting registration, is in fact stating on the MVD form that the change of address is not for voter registration purposes," Defendant again "is willing to accept [Plaintiffs' interpretation of the NRVA as requiring only an opportunity to opt-out] to ensure compliance with the law." (Doc. 22 at 4). Accordingly, the Court will credit Plaintiffs' interpretation of the NVRA opt-out requirement as correct at this stage in the litigation.

In the midst of this unavoidable delay in modifying MVD's forms, Plaintiffs would prefer that Defendant automatically update the voter registration address for all MVD applicants who engage in a Covered Transaction and do not affirmatively opt-out using the current forms. (Doc. 5 at 24). Defendant does receive a data transmission of all MVD Covered Transactions, regardless of whether an individual opts-in or opts-out, for a different purpose (Doc. 28-1 ¶ 23). However, Plaintiffs fail to demonstrate that Defendant has the statutory authority, on her own, to adopt new rules for how the MVD processes voter registrations. (Doc. 26-1 ¶ 7). Arizona Revised Statute §16-112 grants the "director of the department of transportation and the secretary of state . . ., after consultation with all county recorders" the power to "adopt rules to implement a system permitting driver license applicants to register to vote at the same time and place as they apply for driver licenses." A.R.S. §16-112. Moreover, County Recorders, not Defendant, are responsible for updating voter registration addresses in Arizona. (Defendant's Exhibit 21 at

AZSOS000046-48). Federal courts are "powerless" to issue preliminary injunctions against non-parties and the County Recorders are not party to this suit. *See Citizens Alert Regarding the Env't v. EPA*, 259 F. Supp. 2d 9, 17 n.7 (D.D.C. 2003).

Furthermore, Plaintiffs requested relief relating to the counting of OOP ballots also exceeds Defendant's authority. (Doc. 26-1 ¶ 8). Arizona Revised Statute § 16-411 designates the counties as the jurisdictions responsible for coordinating local election activities, and Arizona law also makes the counties responsible for counting provisional ballots. (*Id.* (citing A.R.S. §§ 16-531, 16-602, 16-584(E))). Defendant does not have the authority to force the County Recorders to count OOP ballots. (*Id.*). Even if Defendant wanted to modify the procedures for the upcoming election, any modification of the Arizona Election Procedures Manual requires "consultation with each county board of supervisors" and approval by "the governor and the attorney general not fewer than ninety days before each election." A.R.S. § 16-452(A)–(B). The 90-day deadline to submit modifications for the November 6, 2018 election passed before Plaintiffs filed this lawsuit on August 18, 2018. (*See infra* Part III(C)(1)). Accordingly, Plaintiff has established that MVD forms for Covered Transactions are not in compliance with the NVRA, but has failed to prove that they can attain the relief they seek from Defendant alone.

**B.    Irreparable Harm**

Second, the Court must examine whether Plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief. *Am. Trucking Ass'ns*, 559 F.3d at 1052. Harm that is "merely speculative" will not support injunctive relief. *Id.* at 1057; *see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009) ("the district court need not consider public consequences that are highly speculative" (internal quotation marks and citation omitted)).

**1.    No Deprivation of a Constitutional Right**

Plaintiffs provide that "[i]t is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990,

1002 (9th Cir. 2012) (internal quotation marks and citation omitted). Plaintiffs, however, fail to establish that a constitutional right is jeopardized here. First, Plaintiffs are organizations who may suffer harm due to the diversion of resources, but the organizations themselves do not have voting rights. (*See supra* Part III(A)(1)(a)). To the extent Plaintiffs have associational standing to asserts claims on behalf of their members, no member alleges that they were disenfranchised as a result of a NVRA violation. (*See supra* Part III(A)(1)(b) at n.3). Plaintiff attempt to link the alleged NVRA violation with OOP ballots, but cannot produce any evidence that any person voted OOP in a past election or will do so in the upcoming election because her voter registration address was not automatically updated to match a MVD address change. (Doc. 22 at 7–8).

Not one of Plaintiffs' respective members alleges that she plans to appear at the wrong precinct and vote OOP, nor do Plaintiffs demonstrate that anyone is unable to update her voter registration information and will be disenfranchised as a result of Defendant's actions. (*Id.* at 13). Still, Plaintiffs attempt to establish the alleged NVRA violations with invalid, OOP ballots. (Doc. 5 at 20). Plaintiffs argue—without any citation to support their premise—that many of the 3,970 individuals who attempted to cast an OOP ballot in 2016 "would likely have been able to cast a ballot that was counted if their address had been updated as required by the NVRA and they had been notified of their new polling place." (*Id.*). The Court finds, however, that Plaintiffs only offer "mere speculation" that eligible voters will attempt to vote OOP and become disenfranchised as a result of NVRA violations because Plaintiffs offer no evidence as to the cause of OOP ballots and the effects, if any, of the alleged NVRA violation. (*Id.*; *see also Am. Trucking Ass'ns*, 559 F.3d at 1057). Plaintiffs produce no member or evidence that a member falls into the hypothetical class of voter who updated her MVD address in a Covered Transaction, but did not opt-in to concurrently update her voter registration and will then attempt to vote at an incorrect, OOP address as a result. (Doc. 22 at 13; Tr. at 119:9–10).

### 2. Voter Scenarios

Under Arizona law, all eligible voters must be registered "in both the general

county register and in the precinct register" in which the person resides. A.R.S. § 16-122. Anyone who attempts to vote in a county in which they are not registered is effectively an unregistered voter and, therefore, ineligible to vote, even if they are registered in another county. *Id.* The enforcement of Arizona Revised Statute § 16-122 is unrelated with opt-in or opt-out MVD forms or the underlying NVRA violation alleged by Plaintiffs. There are many other reasons why someone would attempt to vote in the wrong precinct that are wholly unrelated with MVD Covered Transactions and this lawsuit—for instance, a polling place may have moved since the last election. (Tr. at 51:24–25). There are also several means of notifying voters who are registered at incorrect addresses well in advance of the election that should cure any voter registration change-of-address defects. (*See, e.g.,* Defendant's Exhibit 21 at AZSOS000048 (detailing the National Change of Address system); *see also* Tr. at 58:21–59:14).

Furthermore, Plaintiffs put forth no evidence of disenfranchisement generally. If a voter moved within the same county and appears at the wrong precinct for any reason, the voter simply will be redirected to the correct precinct and may exercise her right to vote. (Tr. at 48:12–48:24). If a voter moved within the same county, but did not update her voter registration address and appears at the precinct corresponding to her new address, the voter may cast a provisional ballot at the new precinct, update her voter address on-site, and the vote will count. (Tr. at 110:6–8). If the individual did update her voter address, but appears at her old precinct, the individual will be directed to the correct precinct, in which the voter resides, and her vote will count. (Tr. at 48:12–48:24). The only time an eligible voter's vote will not count would be when an individual insists on voting at the wrong precinct, and then the individual will be informed that she is OOP and that her vote will not count before it is cast. (Tr. at 49:14–19).

Again, the Court finds no causal connection between the alleged NVRA violation and the disallowance of OOP ballots in accordance with Arizona law. *See* A.R.S. § 16-122. Monetary relief is sufficient to compensate Plaintiffs for any financial hardship incurred due to the diversion of resources caused by Defendant's alleged NVRA

violation. *See Krueger Investments, LLC v. Cardinal Health 110, Inc.*, No. CV 12-618-PHX-JAT, 2012 WL 3028349, at \*5 (D. Ariz. July 24, 2012) (citing *Stanley v. Univ. of S. Calif.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (to obtain a preliminary injunction, the moving party must demonstrate that the remedy at law is inadequate)). Accordingly, the Court finds that Plaintiffs will not suffer any irreparable harm in the absence of preliminary relief.

### 3. Irreparable Harm to Defendant

Conversely, Defendant would suffer irreparable harm if the Court granted Plaintiffs' proposed form of relief. A State "suffers a form of irreparable injury" whenever it "is enjoined by a court from effectuating statutes enacted by representatives of its people[.]" *Maryland v. King*, 133 S.Ct. 1, 3 (2012) (citations omitted). Here, Plaintiffs proposed injunction would create an "exception" to Arizona law prohibiting the counting of OOP ballots. (Doc. 24 at 4; *see also* Doc. 29-1).[5] In asking the Court to effectively enjoin a law that passes constitutional muster and has been policy in the State of Arizona "[s]ince at least 1970," Plaintiffs would impose a significant, irreparable harm on Defendant, which has a mandate to enforce Arizona's election laws. *Democratic Nat'l Comm. v. Reagan*, No. CV-16-01065-PHX-DLR, 2018 WL 2191664, at \*8 (D. Ariz. May 10, 2018), *aff'd*, No. 18-15845, 2018 WL 4344291 (9th Cir. Sept. 12, 2018).

### C. Balance of Equities

Next, the Court must determine whether the balance of equities tip in Plaintiffs' favor. *Am. Trucking Ass'ns*, 559 F.3d at 1052. As reasoned above, Plaintiffs fail to establish that anyone will be disenfranchised if the Court does not provide preliminary relief. (*See supra* Part III(A)(1)(b); Part III(B)). Conversely, Defendant will incur great expense to carry out Plaintiffs' requested preliminary relief of posting notices at all polling locations, re-training poll workers to count OOP ballots in contravention with

---

[5] In a recent opinion considering the constitutionality of Arizona's law rejecting OOP ballots, the Ninth Circuit held that the State's "OOP policy was sufficiently justified by Arizona's important interests in light of the minimal burdens it imposes[.]" *Democratic Nat'l Comm. v. Reagan*, No. 18-15845, 2018 WL 4344291, at \*25 (9th Cir. Sept. 12, 2018).

longstanding state policy, and sending hundreds of thousands of mailers that would likely confuse voters. (Doc. 29-1; *see infra* Part III(D) (to the extent that underlying considerations are relevant to both the balance of equities and public interest, the considerations are detailed below)). Plaintiffs' unreasonable delay in bringing this lawsuit also tips the balance of equities in Defendant's favor.

### 1. Laches

"Laches—unreasonable and prejudicial delay—requires denial of injunctive relief, including preliminary relief." *Ariz. Libertarian Party v. Reagan*, 189 F. Supp. 3d 920, 922 (D. Ariz. 2016) (citation omitted). "In the context of election matters, the laches doctrine seeks to prevent dilatory conduct and will bar a claim if a party's unreasonable delay prejudices the opposing party or the administration of justice." *Id.* (quoting *Ariz. Pub. Integrity All.*, 2014 WL 3715130, at *2). "To determine whether delay has prejudiced a defendant, a court considers only prejudice that stems from the plaintiff's delay in bringing suit, not difficulties caused by the fact of having been sued." *Id.* (citing *Shouse v. Pierce Cty.*, 559 F.2d 1142, 1147 (9th Cir. 1977)).

Here, Plaintiffs notified Defendant of the alleged NVRA violations in November 2017, following an investigation that took place in the summer of 2017. (Doc. 1-1 at 2–16). Although Defendant explains that the forms MVD has used "for the past twenty-three (23) years" contained an opt-in question, Plaintiffs became aware of the alleged NVRA violations a minimum of nine months prior to filing suit and seeking a preliminary injunction from this Court. (Doc. 22 at 3; *Compare* Doc. 1 *with* Doc. 1-1 at 2–16). Despite knowing this, Plaintiffs did not file their Complaint and "emergency" motion for a preliminary injunction until August 18, 2018; less than three months before the November 6, 2018 election. (Doc. 1; Doc. 5). Plaintiffs argue that their delay was justified by efforts to resolve this matter outside of litigation. (Tr. at 125:22-126:12). The Court is not persuaded.

At the Hearing, the Court repeatedly asked Plaintiffs' Counsel why this lawsuit was not filed sooner, and why a lawsuit was not initiated against ADOT/MVD—the

architect of the allegedly statutorily-deficient forms—sooner. (Tr. at 99:19–100:19; 125:10–21; 131:13–24). Plaintiffs' Counsel responded that "hindsight as they say is 20/20" and that the timing of how late Plaintiffs could wait to file suit was a matter of litigation strategy, but the Court remains unsatisfied with the excuses behind Plaintiffs' prejudicial delay. (Tr. at 126:16–25). Plaintiff's August 14, 2018 MOU with ADOT provides that Plaintiffs will not raise any claims based on Section 5 of the NVRA against ADOT before December 1, 2018, thus agreeing to leave the heart of the alleged NVRA violations unresolved until after the upcoming election. (Doc. 1-1 at 22–23). The delay in bringing suit in this case is even greater than those where injunctive relief was barred by laches in similar election law matters within the District of Arizona. *See, e.g.*, *Ariz. Libertarian Party*, 189 F. Supp. at 922 (holding that laches required the denial of a preliminary injunction request because the plaintiffs became aware of an opportunity to challenge the constitutionality of a law by August 2015 and did not file their complaint until April 2016; eight months later); *Ariz. Pub. Integrity All.*, 2014 WL 3715130, at *2 (finding that plaintiffs unreasonably delayed in filing suit because the plaintiffs had been considering a constitutional challenge to an election law since December 2013 and did not seek an injunction until May 2014; only months before the November 2014 mid-term election).

"[I]mportantly, Plaintiffs' delay has prejudiced the administration of justice." *Ariz. Libertarian Party*, 189 F. Supp. at 924. The Court set accelerated briefing and the Hearing for September 12, 2018; giving the Court only 16 business days from when the suit was filed until the Hearing. In that time, Plaintiffs alone submitted approximately 181 pages of filings for the Court's consideration. (*See* Docs. 1, 5, 6, 7, 24, 28 (including attached exhibits)). At the Hearing, Defendant moved approximately 975 pages of material into evidence, while Plaintiffs moved 13 additional exhibits into evidence. (Doc. 36; Doc. 37; *see also* Tr. at 18:5). Plaintiffs did so while seeking that the Court order a remedial mailing to go out no later than September 21, 2018; leaving the Court only days to carefully consider the parties' arguments and over one thousand pages of documents in

the record, evaluate the relevant statutory law, rule on Plaintiffs' motion, and advise Defendant and the public as to the state of election law in Arizona and ballot-counting processes on the eve of an election. (Doc. 29-1 at 4). "Such delay strains the quality of decision making and is ultimately unfair to all involved." *Ariz. Pub. Integrity All.*, 2014 WL 3715130, at *2 (internal quotation marks and citation omitted).

Nevertheless, the Court did carefully consider all relevant information in this matter before articulating its findings and conclusions herein. Accordingly, the Court finds that the balance of equities weigh heavily against Plaintiffs due to Plaintiffs' unreasonable and prejudicial delay.

### D. Public Interest

Finally, the Court will consider whether an injunction is in the public interest. *Am. Trucking Ass'ns*, 559 F.3d at 1052. "Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (vacating a Ninth Circuit injunction against the State of Arizona because of "the imminence of the election and the inadequate time to resolve the factual disputes"); *see also Crookston v. Johnson*, No. 16–2490, 841 F.3d 396, 398 (6th Cir. 2016) ("Call it what you will—laches, the *Purcell* principle, or common sense— the idea is that courts will not disrupt imminent elections absent a powerful reason").

As detailed at the Hearing, Plaintiffs' proposed preliminary relief would come at great cost to Defendant. (*See* Doc. 29-1; Tr. at 61:1–62:13). Defendant estimates that approximately 384,000 voters who engaged in a Covered Transaction since November 9, 2016 have a different MVD and voter registration residential address and would be required to receive a mail notice and new voter registration form under Plaintiffs' proposed preliminary relief. (Tr. at 61:7–24). It would cost Defendant approximately $276,900 to order the necessary 390,000 mail letters (estimated at $0.55/letter) and voter registration forms (estimated at $0.16/form), without regard for the logistical and timing

1  challenge of endeavoring to complete such a largescale project on the eve of the
2  upcoming election. (Tr. 62:6–13).

3      Moreover, Defendant estimates that 63,000 of the 384,000 voters in this class
4  moved counties since November 9, 2016 and would undetectably be able to vote twice in
5  the upcoming election if the Court granted an "exemption" from Arizona's prohibition
6  against counting OOP ballots; both in the county from which they moved and the county
7  to which they moved. (Tr. at 65:11–15); *see also* 52 U.S.C. § 20501(b) (stating that a
8  purpose of the NVRA is to protect election integrity). It is perfectly rational for a voter to
9  maintain a different address for MVD and voter registration purposes, so Defendant has
10  not traditionally relied upon MVD address changes to inform voter registration addresses
11  without direction from users to do so. (Doc. 22 at 6). For instance, seasonal workers and
12  members of Native American tribes who attend school or work away from the reservation
13  often use different MVD and voter registration addresses. (Tr. at 71:5–13). It would be
14  speculation for Defendant to assume that all MVD Covered Transactions are meant to be
15  voter address changes when approximately 384,000 eligible voters engaged in a Covered
16  Transaction resulting in different addresses. (Tr. at 67:19–68:3).

17      Additionally, with only 3,970 OOP ballots in 2016, there is hardly a link between
18  MVD Covered Transactions and OOP ballots. (Doc. 22 at 15). It stands to reason that
19  sending out a last-minute notice to 384,000 people to attempt to salvage a maximum of
20  3,970 ballots from being cast OOP would likely cause more harm and confusion among
21  voters than good. *See Purcell*, 549 U.S. at 4–5. Accordingly, Plaintiffs fail to carry their
22  burden of establishing that a preliminary injunction is in the public interest.
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

## IV. CONCLUSION

For the reasons set forth above,

Plaintiffs fail to carry their burden to establish that they are entitled to a preliminary injunction under the traditional *Winter* factors or the Ninth Circuit's alternate formulation. **IT IS ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Doc. 5) is **DENIED**.

Dated this 18th day of September, 2018.

James A. Teilborg
Senior United States District Judge